# CASES

ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF ILLINOIS.

---

(No. 11064.)

JOHN J. WOLF *et al.* Appellees, *vs.* HELEN LAWRENCE *et al.*
Appellants.

*Opinion filed December 21, 1916.*

1. CONTRACTS—*when oral contract is merged into the written agreement.* Where a deed is executed and delivered and at the same time written agreements are entered into declaring the rights and obligations of the parties with reference to the transfer, all previous conversations and oral agreements concerning the subject matter of the transaction are merged in the written agreements.

2. FRAUD—*fraud will not be presumed but must be proved as a fact.* While fraud may be proved by circumstances without direct and positive evidence, still it will not be presumed but must be proved as a fact by such clear and convincing evidence as leaves the mind well satisfied that the allegations of fraud are true.

3. SAME—*motive of party charged with fraud is presumed to be honest.* If the motives and designs of a party charged with fraud may be traced to an honest and legitimate source equally as well as to a corrupt one, the honest source must be preferred.

4. SPECIFIC PERFORMANCE—*when parol contract for conveyance will not be specifically enforced.* A parol contract for the conveyance of real estate will not be specifically enforced unless it is clear, certain and unequivocal in its terms, and the acts claimed as part performance, including the taking of possession, have been done under the contract itself for the sole purpose of performing it.

5. SAME—*specific performance cannot be demanded as a matter of right.* Specific performance cannot be demanded as a matter' of right but rests in the sound discretion of the court, to be determined from all the facts and circumstances of the particular case, .and if the contract is unreasonable or unjust it will not be enforced.

6. SAME—*court may withhold specific performance unless complainant submits to such terms as court deems just.* It is within the discretion of a court of equity to withhold specific performance unless the complainant will elect to submit to such terms and conditions in connection with the subject matter of the contract as the court may deem just and equitable.

7. SAME—*court may order that deeds be executed by the parties, or, upon refusal, by a master in chancery.* A court of equity having acquired jurisdiction to decree specific performance of a contract will retain jurisdiction for the purpose of giving relief and settling the whole matter and may order that the parties execute the deeds, and if they refuse, that the deeds be executed by a master in chancery.

COOKE and DUNCAN, JJ., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

GEORGE P. MERRICK, and CLINTON MERRICK, for appellants.

BEAUREGARD F. MOSELEY, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed in the circuit court of Cook county for relief in a certain transaction involving a contract for warranty deed for a house and lot in Chicago, a deed to a farm in Michigan and an alleged oral contract concerning the sale of said farm and disposition of the proceeds thereof. Appellant John P. Casey filed a cross-bill. After the pleadings were settled the cause was referred to a master in chancery, and his report was approved by the trial court over the objections of appellants and a decree entered dismissing the cross-bill and finding in favor of appellees, the

costs, including master's and stenographer's fees, being adjudged against appellant Casey.

Appellee Mary K. Wolf, on October 31, 1914, was the owner of eighty acres of farm land in Midland county, Michigan. John P. Casey was the owner of a house and lot in Grove avenue, Chicago. Mrs. Wolf's husband was a bricklayer by trade, and Casey had been in the real estate business but was desirous of closing out his interests in that line and devoting his whole time to the banking business. In the latter part of October, 1914, he called on the Wolfs with reference to selling to them this house and lot. After various conferences an agreement for warranty deed was drawn up. This agreement recites that it is made by Helen Lawrence, spinster, party of the first part, and John J. Wolf and Mary K. Wolf, his wife, party of the second part; that if the second parties will make the payments and perform the covenants mentioned, the first party will convey in fee simple the house and lot in question for $2500; that the second parties agree to pay the first party in manner following: $15 cash in hand, receipt acknowledged, and $1285 in monthly payments of $15, or as much more as second parties see fit, beginning December 1, 1914; second parties to assume a trust deed of $1200, and also to pay interest on the amount from time to time remaining unpaid; when $1300 of the purchase price is paid, also all interest, etc., first party is to deliver deed, subject to said $1200 trust deed. The contract also contains the usual clause that upon the failure to make payments it shall be forfeited and determined at the option of the first party, and she may retain the payments made in full satisfaction of all damages, etc. This agreement was signed by John P. Casey and both the Wolfs, and the name of Helen Lawrence was also signed to it. The evidence is that Helen Lawrence had been in Casey's employment in a clerical capacity, and that he had placed the title to this and other tracts of land in her name as a convenience in making trades. We understand from

the evidence that Casey signed Miss Lawrence's name to this contract, and that although she had no objection to his so doing she did not know of it until the latter part of November, 1914, when she signed papers conveying the legal title to this property to Casey. Before that time she understood she held the land as trustee for Casey. At the same time this agreement was executed and delivered another contract was entered into by them which reads as follows: "Agreement entered into this thirty-first day of October, 1914, between John P. Casey and John J. Wolf and Mary K. Wolf, his wife, that the said John P. Casey will sell a farm in Michigan for John J. Wolf and Mary K. Wolf as their agent, and the proceeds of said sale to be applied on a certain contract now in force between Helen Lawrence and John J. Wolf and Mary K. Wolf for the purchase of premises No. 5738 Grove avenue. In case said farm should be sold by John J. Wolf and Mary K. Wolf, or any other agent, the proceeds of said sale shall apply on said contract for purchase of premises 5738 Grove avenue."

November 11, 1914, the Wolfs, by warranty deed absolute in form, conveyed the Michigan farm to appellant Casey, subject to a mortgage of $1000 and accrued interest. This deed was placed on file a few days later in the county where the land is situated. Casey, his son James and Miss Anna Levy, a clerk in his employ, all three testified that these two agreements dated October 31, 1914, and the deed to the Michigan farm dated November 11, 1914, were all executed and delivered the same day, November 11, 1914. Appellee Mrs. Wolf testified that the two agreements were executed and delivered the day they were dated, October 31, 1914, and that the deed to the Michigan farm was executed the day it was dated. We find no other testimony in the record on this point. Mrs. Wolf testified that Casey asked $2500 for the house and lot on Grove avenue, and that she told him she didn't have any cash and wanted to trade her Michigan farm for it; that he said

he was getting out of the real estate business and did not want to take another piece of real estate in exchange, but afterward agreed to make an even exchange of the house and lot for the farm if he found the farm was worth it; that she told him she would not do that, as the farm was worth $3600 and the house only $2500; that finally it was agreed that he should take the deed for the Michigan farm as security for the house and lot; that if she could sell the farm for more than $2500 she should have the excess over the $2500, and the $2500, if paid before the first of the following May, should be taken by him in entire payment for the house and lot on Grove avenue; that if Mrs. Wolf or her agent found a buyer he would deed the farm to the buyer. She further testified that on February 23, 1915, she informed Casey that she had a buyer for the Michigan farm, Anna Hoffman, who had paid her $10 as a deposit on the purchase, and that she (Mrs. Wolf) then asked Casey to make the deed to Anna Hoffman and give witness a deed to the house and lot; that Casey then said that she could not sell the farm,—that the house was his and the farm was his, and that if she spoke like that again he would put her in jail for twenty-five years; that she asked Casey three times to make a deed of the farm to Anna Hoffman, but he refused each time. A daughter of Mrs. Wolf testified that she heard this conversation between her mother and Casey as to the deed to the farm to Anna Hoffman, and that Casey refused to deed the farm and said he would put Mrs. Wolf in jail for twenty-five years. Casey denied making any oral agreement as to applying the proceeds of the farm, and testified that the only agreement as to that matter was the written one dated October 31; that the deed to the Michigan farm was given to him to secure him on the contract for the Grove avenue house; that the Wolfs stated they expected to sell it to a Mr. Snyder and his daughter and would apply the purchase money on the contract; that he told the Wolfs if they did not

succeed in selling the farm to the Snyders he would adver-
tise it and try to sell it, and in the meantime they were to
do the same or place it in some agent's hands to sell; that
he asked originally for the Grove avenue property $2600
but reduced the price to $2500, and agreed to make the
trade if they would give him the deed to the Michigan land
as security; that he had no conversation with Mrs. Wolf
on February 23 about a buyer having made a deposit of
$10 on the farm; that he did have a telephone conversa-
tion with the daughter about such purchaser and deposit of
$10, in which he said they could not close the deal with-
out coming to his office, and that he did state if they did
any crooked work he would put them in jail for it; that
this conversation was in April, 1915, after the first notice
of forfeiture was served, and that the Wolfs did not men-
tion having a purchaser until that month.

On April 29, 1915, Casey served Mr. and Mrs. Wolf
with a written notice that unless they paid him $118.98
on the contract by May 9 the contract would be forfeited.
Thereafter he brought suit in the municipal court for pos-
session of the premises but later took a non-suit. June 4,
1915, Casey and his former partner, Coleman, called at the
house on Grove avenue where the Wolfs lived and laid a
notice on the door-step or on Mrs. Wolf's arm, to the ef-
fect that unless $137.50 was paid on the contract by June 14
the contract would be forfeited. Casey and Coleman both
testified that at the same time the notice of June 4 was left
Casey tried to give Mrs. Wolf a quit-claim deed from him-
self and wife to the Michigan farm; that upon her refusal
to take it he laid it on her arm and she crumpled it up and
threw it after him, and they left it lying there. Mrs. Wolf
and her daughter testified that when this last notice was
left, Casey and Coleman tried to make Mr. and Mrs. Wolf
sign a quit-claim deed to the house and lot. Casey's copy
of the agreement as to the Grove avenue property shows in-
dorsements on December 5, 1914, interest $12.43 and prin-

cipal $15, and on January 23, 1915, principal $15. Mrs. Wolf admits that these payments were made and she also claims that she paid another $15 on the principal, and it also appears that she paid $10 for insurance.

The master found in his report, after setting out the testimony, that from the inception of the negotiations Casey intended by unfair means to defraud appellees of their Michigan farm and require them to pay him the full price of $2500 for the house and lot, and that Casey intended to retain title to the house and lot until it was thus paid for. The decree finds the same as the master on these points, and further, as a conclusion of law, that said fraudulent intention on Casey's part took the oral contract testified to by appellees' witnesses out of the Statute of Frauds, and that appellees were entitled to a deed from Casey and his wife to the house and lot on Grove avenue, free and clear of incumbrance, and also that Casey was to pay appellees $100 and costs, including master's and stenographer's fees, the court retaining jurisdiction of the subject matter and of the parties for such further proceedings as may be necessary to carry the decree into effect.

If appellants are right in stating that the deed to the Michigan land was executed and delivered at the same time the other two contracts were, then all previous conversations and oral agreements concerning the subject matter of the contract were merged in the written agreements. (*Lanum* v. *Harrington,* 267 Ill. 57; *Grubb* v. *Milan,* 249 id. 456.) Mrs. Wolf, the only witness on this point on behalf of the appellees, testified that the two agreements were executed on October 31, 1914, the date they bear. The master found that both these agreements were executed on Sunday, November 1, 1914. The decree found the same, while Casey's testimony is that they were all executed along with the deed to the farm, on November 11. We think the weight of the testimony tends strongly to support Casey's position on this point.

If it be conceded, however, that the conclusion as to the oral agreement being merged in the written agreement does not necessarily follow from the record, then any oral contract relied upon as to the selling of the Michigan farm and the disposition of its proceeds must be established by clear and unequivocal evidence, and the acts claimed as constituting part performance must have been done under the contract itself for the sole purpose of performing it. (*Kane* v. *Hudson,* 273 Ill. 350; *Christensen* v. *Christensen,* 265 id. 170.) The rule is well settled in this State that a parol contract for the conveyance of real estate will not be specifically enforced unless it appears to be clear, certain and unequivocal in its terms, and the proof upon which the conveyance is asked must be established so convincingly as to leave no reasonable doubt in the mind of the court. (*Lonergan* v. *Daily,* 266 Ill. 189, and cited cases.) It must also affirmatively appear that possession was taken under the contract. It is not sufficient that the party was previously in possession. (*Shovers* v. *Warrick,* 152 Ill. 355; *Christensen* v. *Christensen, supra; Lonergan* v. *Daily, supra.*) The evidence was not at all clear as to when possession was taken. Mrs. Wolf testified they moved into the premises on Grove avenue about November 12, 1914. Casey testified that the Wolfs moved into the premises the week commencing November 1. The contract as to the farm land and that as to the sale of the Grove avenue property are consistent with Casey's testimony with reference to the sale of the Michigan farm and the application of the proceeds and are inconsistent with the appellees' testimony. It does not seem reasonable, in view of the written agreement as to the Michigan farm, that within a very few days after executing it Casey would make an entirely new agreement with reference to the sale and application of the proceeds of that farm without destroying the old agreement and making a new one in writing. The admitted facts as to the payments made by appellees on the Grove avenue prop-

erty tend to uphold the claims of Casey as to the transactions rather than the claims of the Wolfs.

We do not think that the claim of fraud asserted by appellees with reference to this transaction is upheld by the evidence in the record. That claim seems to be based quite largely upon the fact that the Grove avenue property, at the time the trade was made, was in the name of Miss Lawrence instead of Casey. We do not regard that as proof of fraud. The original contract for the sale of the Grove avenue house was signed by Casey as well as in the name of Miss Lawrence, and the evidence shows without contradiction, as we understand it, that Casey signed Miss Lawrence's name to that document. Appellees certainly knew that Miss Lawrence was named as the owner in the contract at the time it was executed. There seems to have been no attempt on the part of Casey to conceal that fact, and he could not conceal it in view of the fact that the contract was drawn in the name of Miss Lawrence as party of the first part. While it is true that fraud may be proved by circumstances, that we seldom expect to prove it by the admissions of the party and often cannot find direct and positive evidence of such fraud, (*Schwarz* v. *Reznick*, 257 Ill. 479,) and that proof of circumstances which convince the mind that fraud has been perpetrated is all that is required, still fraud will not be presumed but must be proved as a fact by such clear and convincing evidence as leaves the mind well satisfied that the allegations of fraud are true. If the motives and designs of a party charged with fraud may be traced to an honest and legitimate source equally as well as to a corrupt one, the honest source must be preferred. *McKennan* v. *Mickelberry*, 242 Ill. 117, and cases cited.

Specific performance cannot be demanded as a matter of right but rests in the sound discretion of the court, to be determined from all the facts and circumstances of the particular case. If the contract is unreasonable or unjust,

or for any other good reason should not be performed, a decree will not be granted. (*McDonald* v. *Minnick,* 147 Ill. 651; *Espert* v. *Wilson,* 190 id. 629; *Dreiske* v. *Eisendrath Co.* 214 id. 199; *McKennan* v. *Mickelberry, supra.*) To enforce the oral contract testified to by appellee Mrs. Wolf in the manner that the decree orders it enforced, in our judgment would be most unjust to appellants. There is no testimony as to the value of the Michigan farm except that of Mrs. Wolf and Casey. She testified that the farm cost her $2600 and was worth $3600, and that there was a mortgage of $1000, on which no interest was due November 11, 1914, and that the taxes were paid. Casey testified that the farm land was worth $800 or $900, and that the taxes and interest on the mortgage had not been paid for two years and the owner of the mortgage was threatening to foreclose; that the farm was unimproved and growing up to weeds. Casey testified that the Grove avenue property was worth $2600 and there was a mortgage on it of $1500. His former partner, Coleman, testified it was worth from $2500 to $2800. A real estate man, Travis, testified it was worth $1950. Casey testified that he had also made repairs since the Wolfs went into possession that cost him $215. To require, as the decree does, that Casey shall deed the Grove avenue property to the Wolfs clear of incumbrance, pay them $100 and pay the costs of this suit, and as a result of the trade that he have the Michigan farm, mortgaged for $1000, with any unpaid taxes and interest there may be, is certainly not justified by the evidence in this record.

It is absolutely essential to sustain the decree that the evidence in the record should clearly support the conclusion that Anna Hoffman made a *bona fide* offer for the farm in Michigan of $2600 over and above the incumbrance on that farm and was able to carry her offer out. She, herself, did not testify. No reason is given why she was not called and there is no proof as to her financial ability to

make good on such an offer. The only testimony on this point is that of Mrs. Wolf that Anna Hoffman made such an offer and paid $10, and the further testimony of Mrs. Wolf and her daughter that they told Casey that such an offer had been made and he refused to deed the farm. Casey's version, stated above, does not agree with this testimony in many important particulars. The evidence as to Anna Hoffman being a *bona fide* purchaser, able and willing to execute and carry out her offer, is not of such a clear and satisfactory character as to authorize the entering of the decree here in question.

While the specific relief asked for in the bill and allowed under the decree in this case does not appear to be authorized by the evidence in the record, still the evidence does authorize specific performance under conditions fair to all parties in view of the written agreements entered into by them. It is universally conceded that it is impossible for the courts to lay down any inflexible rule by which it may be determined in any given case whether specific performance should or should not be decreed. Each case must rest, in a large measure, upon its own particular facts and peculiar circumstances. The general aim of a court should be to grant equitable relief of such a nature as will best accomplish the ends of justice. It is within the discretion of a court of equity to withhold specific performance unless the complainant will elect to submit to such terms and conditions in connection with the subject matter of the contract as the court may deem just and equitable. (26 Am. & Eng. Ency. of Law,—2d ed.—65 ; 36 Cyc. 752, and cases cited.) This court, in *Bear* v. *Fletcher,* 252 Ill. 206, ordered specific performance as to a part of the contract and damages as to the remainder of the contract. In *Attebery* v. *Blair,* 244 Ill. 363, the court ordered the sale of the defendant's interest in certain property if he did not choose to pay the purchase money within forty days and receive the deeds. In *Thayer* v. *Star Mining Co.* 105 Ill. 540, the

court ordered one of the parties to build the railroad in accordance with the agreement, and, if it was not constructed within a certain time, decreed that within sixty days from the entry of the decree all of certain rights and interests under the contract should be forever extinguished. See, also, the following cases, where terms and conditions were fixed as a part of the decree of specific performance: *De-Walsh* v. *Braman,* 160 Ill. 415; *Harrison* v. *Polar Star Lodge,* 116 id. 279; *Worden* v. *Crist,* 106 id. 326.

On the record before us, the written contracts as to the sale of the house and lot on Grove avenue and the sale of the Michigan farm should be carried out except as to the matter of time. A court of equity having acquired jurisdiction to decree specific performance of a contract will retain jurisdiction for the purpose of giving relief and settling the whole matter. (*Griffin* v. *Griffin,* 163 Ill. 216.) In view of the conditions that have arisen since the closing of the contracts, appellees, the Wolfs, shall be given three months after the decree shall be entered in the court below in which to sell the Michigan farm at such price as some purchaser in good faith will pay and they are willing to let the farm go for, and if it is so sold Casey shall make a deed to the purchaser, and the proceeds shall be applied on the payment of the balance due on the contract for the house and lot on Grove avenue to the extent it will reach, and if there is any surplus it will belong to Mrs. Wolf. If appellees are not able to so sell the farm at a price satisfactory to them within three months after the entry of the decree below, then Casey shall have three months in order to find a purchaser at a price that is satisfactory to the trial court, the proceeds to be applied as above specified. After the expiration of six months, if no such purchaser is found, the court is directed to decree that the deed to Casey from the Wolfs to the farm vests title in him at a price the court, after hearing such evidence on the subject as the parties desire to offer, deems fair to all the parties in interest,

and to apply such price on the Grove avenue house and lot. A court of equity having acquired jurisdiction of the parties to a contract may order a decree for specific performance by directing the parties to execute a deed, and if the proper parties refuse, direct the execution of the deed by a master in chancery. (*Poole* v. *Koons,* 252 Ill. 49.) After the sale or other disposition of the farm as herein provided, the court is authorized and directed to adjust the rents, interest, improvements, etc., on the Grove avenue property and the Michigan farm and the costs before the master, the circuit court and this court, in such a manner as is just and equitable to all the parties to this litigation, having in mind the facts and circumstances with reference to this transaction as heretofore set out in this opinion. If the total payments credited to the Wolfs on the principal of the contract for the Grove avenue house and lot after following the procedure above specified are found to aggregate $1300 or more, the Wolfs will be entitled to a deed to said house and lot according to the contract, upon assuming or giving back a trust deed for the balance as provided by the contract, otherwise the monthly payments shall be resumed and the contract for the house and lot shall proceed according to its terms as to the balance found due thereon, with such modifications as to time as required to do equity between the parties.

The decree of the circuit court is reversed and the cause is remanded for further proceedings in harmony with the views herein set forth.

*Reversed and remanded, with directions.*

COOKE and DUNCAN, JJ., dissenting.